**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 24-cr-00247-NYW-6

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**6. NEWMAN CASTILLO-DELGADO,**

**Defendant.**

---

**REPORTER'S TRANSCRIPT**
**(Sentencing Hearing)**

---

Proceedings before the HONORABLE NINA Y. WANG, Judge, United States District Court, for the District of Colorado, commencing at 1:30 p.m. on the 17th day of December, 2025, Alfred A. Arraj United States Courthouse, Denver, Colorado.

**A P P E A R A N C E S**

**FOR THE PLAINTIFF:**
LEAH MARIE PERCZAK, U.S. Attorney's Office, District of Colorado, 1801 California Street, Suite 1600, Denver, CO 80202

**FOR DEFENDANT NO. 6:**
STEPHANIE GRISMER, Archambault Grismer Wetli LLC, 1888 Sherman Street, Suite 650, Denver, CO 80203

**DECEMBER 17, 2025**

(Proceedings commence at 1:30 p.m.)

THE COURT: Thank you. Please be seated.

Good afternoon. We are convened in open court in Case No. 24-cr-247-NYW-6, United States of America v. Newman Castillo-Delgado. I am United States District Judge Nina Y. Wang.

Counsel, would you enter your appearances, and introduce anyone at the table with you.

MS. PERCZAK: Good afternoon, Your Honor, Leah Perczak on behalf of the United States.

THE COURT: Good afternoon, Ms. Perczak.

MS. GRISMER: Good afternoon, Your Honor, Stephanie Grismer appearing as CJA counsel on behalf of Mr. Castillo-Delgado. He is present in custody at defense table.

THE COURT: Good afternoon, Ms. Grismer. Good afternoon, Mr. Castillo-Delgado.

The Court notes Mr. Castillo-Delgado is present in person with his counsel.

Madam deputy, would you please swear our interpreters.

(The interpreters are sworn.)

THE COURT: Mr. Castillo-Delgado, do you understand our interpreter?

THE DEFENDANT: Yes.

THE COURT: Counsel, are you ready to proceed?

MS. PERCZAK: Yes, Your Honor.

MS. GRISMER: Yes, Judge.

THE COURT: The record reflects that the defendant was charged by a Second Superseding Indictment on April 24, 2025, that is Docket Entry No. 76, and he was arraigned on that Superseding Indictment on April 30, 2025, Docket Entry No. 86. At that time he entered a plea of not guilty.

On July 14, 2025, the defendant filed with this Court a notice of disposition, which is Docket Entry No. 99. On August 20, 2025, Mr. Castillo-Delgado appeared before this Court, withdrew his plea of not guilty, tendered a plea of guilty to Counts 1 and 2 of the Indictment, charging violations of 18 U.S.C. Section 1951(a) and 2, Hobbs Act Robbery, and 18 U.S.C. Sections 924(c)(1)(a)(ii) and 2, brandishing a firearm in connection with a crime of violence, and was adjudged guilty of those offenses.

The purpose of today's hearing is for me to determine a sentence for those offenses.

Mr. Castillo-Delgado, is there anything about your condition today that would make you unable to understand what is going on?

THE DEFENDANT: No.

THE COURT: During this proceedings, if at any time you need to speak with your attorney, please let me know and we will make that arrangement for you to do so, okay?

THE DEFENDANT: Okay.

THE COURT: Ms. Grismer, have you and your client read and discussed the presentence investigation report, which is at Docket Entry No. 103; the revised presentence investigation report, which is at Docket Entry No. 169, and the addendum thereto?

MS. GRISMER: Yes, Your Honor.

THE COURT: Ms. Grismer, it appears that the defendant has filed objections to the presentence investigation report, that is reflected at Docket Entry No. 149, in which he agrees to the guideline calculation but objects to certain factual allegations regarding his membership in the TdA gang out of Venezuela and facts related to pending cases with similar conduct; is that correct?

MS. GRISMER: That's correct, Your Honor.

THE COURT: And then, Ms. Perczak, does the Government have any objection to the PSR?

MS. PERCZAK: Your Honor, we do not.

THE COURT: Any further argument regarding, first, the objection related to pages R6 and R7 with respect to

the defendant's alleged membership with TdA?

MS. GRISMER: Not from defense, Your Honor.

MS. PERCZAK: Your Honor, unless the Court has questions, I don't have anything to add.

THE COURT: All right. So based on the Court's review of Docket Entry No. 161 and the Government's response to the defendant's objection, including the report attached from law enforcement, the Court overrules the defendant's objection with respect to his membership in TdA.

The Court finds by a preponderance of the evidence that the Government has established that this defendant was affiliated and was a member of TdA, and finds that the language in the report is appropriate and overrules that objection.

Moving on to the second objection, which is argument regarding the objection to similar conduct on alleged offenses, any other argument with respect to that?

MS. GRISMER: Not from defense, Your Honor.

MS. PERCZAK: No, Your Honor.

THE COURT: All right. So while the Court notes that those charges, as reflected in the presentence investigation report, have not been established, or he has not yet been convicted for those, the Court finds that it is appropriate to include those in the presentence

investigation report as other conduct that may bear on sentencing.

And the Court will note, however, in its consideration it has weighed the fact that those charges have not yet been proven or he has not pled to them. The Court does further note, however, that implicit in the mitigation report that was supplied at Docket Entry 157-1, it appears that that mitigation report is related to the offense, as reflected in paragraph 66, and includes a statement in which it states that the defendant would be willing to serve probation for that offense, which implicitly suggests that he is conceding that that offense did, in fact, occur, and that he is guilty of the elements of that crime as charged.

However, again, as the Court notes, the Court will simply consider that as part of the background character and conduct of a person that it may weigh and receive in consideration of imposing an appropriate sentence, and the Court has indicated what weight it will give to such facts, as alleged in the PSR. Accordingly, that second objection is also overruled.

The Court further notes that neither the Government nor the defendant has challenged any other aspect of the presentence investigation report, therefore, the remaining factual allegations in the guideline applications are

adopted without objection as the Court's findings of fact concerning sentencing.

The Court will also grant the Government's motion for a 1-level decrease based on United States Sentencing Guideline Section 3E1.1(b) for acceptance of responsibility; that is Docket Entry No. 107.

Accordingly, the Court concludes that the total offense level is 29, the defendant's Criminal History Category is I. The advisory guideline range for Count 1 is 87 to 108 months, and for Count 2, the minimum term of imprisonment is 84 months, to run consecutively to any term of imprisonment for Count 1. This results in a total sentencing guideline range of 171 months to 192 months of imprisonment.

Any dispute with respect to that guideline calculation?

MS. PERCZAK: No, Your Honor.

MS. GRISMER: No, Your Honor.

THE COURT: The Court will further note that the advisory range for supervised release is not more than 3 years for Count 1, and for Count 2, not more than 5 years; the fine range is $30,000 to $250,000; and the special assessment per count is $100, for a total of $200,000.

The Court will formally accept the plea agreement.

The defendant has filed a sentencing statement in

which he advocates for a total guideline sentence of 171 months, that is at Docket Entry No. 157. The Government has responded advocating for a total guideline sentence of 192 months, presumably comprised of 108 months on Count 1, plus 84 months on Count 2, and 5 years of supervised release, that is Docket Entry No. 158.

But, Ms. Perczak if I am correct, 5 years of supervised release can only attach to Count 2, it cannot attach to Count 1.

MS. PERCZAK: That's correct, Your Honor. I think the Court could structure essentially a concurrent term of supervised release with 3 years as to Count 1, to be run concurrently with the lengthier sentence on Count 2.

THE COURT: All right. And then the probation department recommends a variant sentence of 156 months on Count 1, 84 months on Count 2, for a total of 240 months; 3 years of supervised release, to run concurrently on Counts 1 and 2.

Anything else that the Government believes that we need to address before I give the parties an opportunity to be heard?

MS. PERCZAK: I noted, Your Honor, that the Court received and granted the motion related to a monetary judgment in this case, so I don't think there is anything else that I need to address in terms of restitution.

THE COURT: All right. So before we get to the sentencing, I actually just have one housekeeping matter, and we can address it at the end if more appropriate, but there were a few pending Motions to Restrict, which were Docket Entry Nos. 160 and 163.

The Court had previously denied the Government's Motion for Protective Order, ordered you to re-file any Renewed Motion for Protective Order. A Renewed Motion for Protective Order was not filed by the deadline, so I guess what I am wondering is what impact that has on the Motions to Restrict, or if I can just deny them at this time, or how to proceed about that.

MS. PERCZAK: Certainly, Your Honor, I am happy to clarify for the Court, because I apologize this wasn't clear. So the Motion for Protective Order relates to different discovery that is not any part of my Motions to Restrict. And to be clear, we are just going to proceed under the original Protective Order that the Court has granted previously that the Court referenced in its Order. I did not file a renewed motion in light of the Court's ruling.

So for 160 and 163, those really relate solely to the exhibits that I filed that, for reasons laid out in my motion, we are seeking to restrict.

THE COURT: All right. Ms. Grismer, as I

understand it, there is no objection filed by this defendant with respect to the Motions to Restrict; is that right?

MS. GRISMER: That's right.

THE COURT: All right. So just as a matter of housekeeping, the Court will grant the Motions to Restrict at Docket Entry Nos. 160 and 163, and those exhibits will be maintained as restricted on the docket.

All right. Ms. Grismer, anything else that you believe that we need to address before we discuss what the appropriate sentence is?

MS. GRISMER: No, Your Honor.

THE COURT: All right. So, Ms. Grismer, at this time I will give you an opportunity to speak on your client's behalf as to the sentence you believe is appropriate. Then, Ms. Perczak, you will have an opportunity to speak as to the sentence that the Government believes is appropriate.

Now, are there victims who are present who would also like to speak.

MS. PERCZAK: Yes, Your Honor. One victim is present and would wish to address the Court.

THE COURT: All right. So we will take her first, and then you can make your argument.

And then, Mr. Castillo-Delgado, you will have an

opportunity to address the Court if you wish before I impose sentence. You are not obligated to do so, but I am happy to listen if you would like to say something.

All right. Let's proceed. Ms. Grismer.

MS. GRISMER: Your Honor, where would the Court like me, at the podium or at the table?

THE COURT: It is a little easier when you are at the podium.

MS. GRISMER: Sure.

THE COURT: Thank you.

MS. GRISMER: Thank you, Your Honor. Your Honor, I do not intend to go through all of the information that was contained in the defendant's sentencing statement, as well as the Exhibit A that was attached, which as the Court has already sort of referred to this afternoon, which was the mitigation report that contains the information about Mr. Castillo-Delgado's life and his social history up until this point.

I will ask that the Court -- I will maintain the position and ask the Court to impose a guideline sentence in this case, and specifically a guideline sentence of 171 months total, which is, as the Court knows, a little over 14 years total in this case.

I would also ask the Court not to impose a term of supervised release, just simply relying on 5D1.1(c), given

that Mr. Castillo-Delgado does have an immigration detainer in this case and will be deported upon completion of his sentence in the Bureau of Prisons.

THE COURT: So let me ask you this, Ms. Grismer, if the total incarceration range that you seek is 171 months, doesn't that leave a below-guideline range -- no, it is the low-end-of-the-guideline range with respect to Count 1; is that right?

MS. GRISMER: Yes. So, specifically, Judge, and I think it is confusing with the two counts and, frankly, I made an error in my sentencing statement because of that. But to be clear, for Count 1, I am requesting the minimum guideline sentence of 87 months, and then with the addition of the mandatory minimum 7 years, or 84 months, for Count 2, I believe brings us to a minimum guideline range of 171.

THE COURT: Correct.

MS. GRISMER: Your Honor, we believe that such a sentence would be sufficient, but not greater than necessary, to achieve the purposes of sentencing under 18 U.S.C. 3553(a)(2).

I will note that that sentence provides a significant prison sentence/incarceration, removal from the community, as well as punishment for the offenses to which Mr. Castillo-Delgado pled guilty.

Any sentence that the Court imposes within the guideline range will be a significant sentence, and Mr. Castillo-Delgado will be more than a decade older at the time any sentence may be served.

I would ask that the Court not impose the upward variance that was recommended by the probation department, and I included most of the reasons in the sentencing statement, but I would like to point out that all of the circumstances of this offense were accounted for in the guidelines, as far as the significant increase in level from 20 all of the way up to, I believe it was 32 or 31, and then with the acceptance of responsibility, decreases.

Mr. Castillo-Delgado's actions in this case under the nature and circumstances of the offense, when viewed in light of the mitigation provided to the Court, I believe keep the Court's sentencing range within the guideline range in this case, and that an upward variance would be greater than necessary to achieve the purposes of sentencing with regard to the offense, as well as Mr. Castillo-Delgado's character and his social history and the mitigation that has been presented.

I also think it is important to note that not only does Mr. Castillo-Delgado's acceptance of responsibility give the Government a break, if you will, or a benefit to not proceeding to trial in this case but, frankly, more

importantly, it does not require the victims in this case to go through those proceedings, and to hopefully provide them with some form of closure and finality, at least as it pertains to Mr. Castillo-Delgado, for him being the first person involved with these cases to accept responsibility and accept the punishment that this Court is going to impose today.

Your Honor, I understand the Court overruled the objection when it came to Mr. Castillo-Delgado's membership or affiliation, or however it wants to be framed, with the TdA gang, but really why that is important, I think, to this Court and to Mr. Castillo-Delgado is that we are asking this Court to sentence him based on who he is and his actions in this particular case, the harm that he caused to the victims.

I think it is important for the Court to think about how he got here physically into the United States, but also to this point, where he became involved and committed these acts in this case. This is not someone who has deep ties to this group or association. Frankly, I think that the same evidence that the Court took into consideration to overrule the objection, itself, sort of explains a minor affiliation or connection to this larger group, and I think that that is important.

It is important that Mr. Castillo-Delgado came to

the United States with his significant other and their infant daughter, and that's it, and that he came here after enduring an extremely violent and difficult upbringing. I would characterize his life thus far as survival.

Growing up, having to survive mostly on his own, traveling to the United States, and surviving that journey and the violence and the unknowns as it related to that, and then frankly his existence in the United States. Survival, I think, can certainly take the form of some ugly behaviors, and that is certainly how it manifested in this case, coupled with substance abuse, as is noted in the presentence report.

Certainly Mr. Castillo-Delgado found individuals here in the United States who may have had a similar upbringing to him, may have been from the same country or region as him, and probably went through a lot of the things he went through in his life. As a result of that, he was presented with this opportunity, frankly, to take part in this robbery of the jewelry store and potentially make some money from that. That was the goal.

I understand that, and Mr. Castillo-Delgado understands that nothing excuses his behavior and the acts that he committed and that he has taken responsibility for, and for the harm and the trauma that the victims in

this case endured, and certainly continue to endure based on the statements that we have received from them and what I anticipate they will tell the Court this afternoon.

At this point, Mr. Castillo-Delgado, all he can do is accept responsibility and accept the punishment from this Court. And he understands that nothing that has been presented to the Court today, certainly on his behalf or in the statement -- in the sentencing statement that was provided previously, nothing diminishes or takes away from the harm that was caused in this case, but it is important for the Court to consider those circumstances, in addition to the nature and circumstances of the offense and all of the other factors, all of the other statutory factors under 3553.

Based on all of those circumstances, Your Honor, we are asking that the Court impose a guideline sentence of 87 months for Count 1, 84 months for Count 2, for a total of 171 months, which will place Mr. Castillo-Delgado in the Federal Bureau of Prisons for at least 14 years plus a little bit. We believe that would be a sentence that is sufficient, but not greater than necessary, to account for all of those varying factors in this case. Thank you.

THE COURT: Thank you, Ms. Grismer.

Ms. Perczak.

MS. PERCZAK: Thank you, Your Honor. It sounds

like the Court would like to hear from the victim first.

THE COURT: Yes.

MS. MUNOZ: Good afternoon.

THE COURT: Good afternoon.

MS. MUNOZ: My name is Myrna Munoz.

THE COURT: Could you spell that, please.

MS. MUNOZ: M-Y-R-N-A, last name is M-U-N-O-Z.

THE COURT: Thank you.

MS. MUNOZ: I came here because I want you to know what it was like to be at the jewelry store when this robbery happened. We have been working at that jewelry store as a family for a little over 25 years. We are not a family that comes from money. We, as well as Mr. Newman, are immigrants to this country. I didn't have much growing up, and the little that we did get to have, after working for 25 years, was taken away from us.

I was at the jewelry store, with my two kids present. My son was 1 years old, and my daughter was 13 years old, and she had a gun pointed to her head. We are reminded every day of what we went through. She won't sleep in her room. She does not want to be away from me. Every time she knows that I go to work, they will call me from school because she had an anxiety attack or because she had a panic attack.

The day of the robbery, they didn't just steal our

dreams, they stole, most importantly, our peace, and they took things that didn't even belong to us. We had recently started working with a new provider, and he was sending us jewelry for us to try to sell more, and we would return it or pay it if it would sell.

So after this, our insurance didn't even pay a fourth of what we owed that wasn't even paid off. So now a year-and-a-half later, we are not only starting from zero, but we are in great debt, and not to mention that no insurance policy will cover us now.

So my mom doesn't sleep. My brother doesn't sleep. We are constantly checking the cameras. We upgraded our security, which costs money. Now I'm struggling to pay for my daughter's education, even my mortgage some months, because we are in so much debt.

I have panic and anxiety attacks. The victims' program helped us pay for therapy for a year, but now we continue to take therapy to try to manage, but it's coming out of pocket because we already went through the funds.

I think that our lives are not going to be the same. And I just wanted you to hear how it had impacted my family.

THE COURT: Thank you, Ms. Munoz.

MS. MUNOZ: Thank you.

THE COURT: Ms. Perczak.

MS. PERCZAK: Thank you, Your Honor. Your Honor, it sounds like the Court did receive the other two victim impact statements.

THE COURT: I did.

MS. PERCZAK: Thank you. I apologize for the lateness that those arrived and were translated, but I did want to ensure that the Court had both of those. One of the two letters is -- and I think the Court probably can see this from the context, but it is from one of the victims who was physically beaten by the defendant with a firearm, and then the other, obviously, was also present at the robbery.

Your Honor, I would like to start back with the day of the robbery, and I provided the Court with a lot of surveillance footage from this case. I do find it sometimes the best way to impress upon the Court what happened, what this robbery looked like, and it is sometimes more effective than just sort of describing it from memory.

On that day, and as Ms. Munoz said far better than I can, Joyeria El Ruby was open, it was operating for business the same way they have done for 25 years. That store does hold a significant place in the community because it's family-owned and operated.

And when we initially spoke with Ms. Munoz and her

family members, they described to us that they make their business on repeat customers. So they make their business by having relationships with other wholesalers, having relationships with families in the community that come back to the business year over year and support their family.

The store was also security conscious. As I think the Court could see from the video, they had a mantrap, sort of a cage in the front of the store that was not opened and wasn't unlocked until the defendants, including Mr. Castillo-Delgado, took off their sunglasses and hats. They had panic buttons. They had a very robust surveillance system, as the Court could see, and there was even a firearm in the store.

All of these measures that this family put in place to try to avoid something like this, were rendered completely meaningless in the face of what the defendant and his co-defendants did. As the Court could see on Exhibit 4, the robbery began with something like a ruse.

One of Mr. Castillo-Delgado's co-defendants, Mr. Lozada-Solis, came in to sort of surveil the store, he strikes up a conversation with one of the employees, and then he sent a message to the rest of the group saying, it is open, looks good, come on in.

Then the defendant and two of his co-defendants

enter through the mantrap, acted like customers, took off their hats, and were led inside by Ms. Munoz and the other employees.

Immediately, as the Court could see from that video, the defendant is one of the first people to pull his gun out. He is careful to rack the slide as he walks in the store to make it clear that it is a real gun and that he means business. And as soon as he gets the gun out, almost every employee is immediately compliant.

The Court could see that in the front of the display cases there were customers, and all of the customers immediately sort of grab each other and go to the ground. Another employee was brought over the front of the display case and lays on the ground with the customers.

If the Court reviewed then Exhibit 8, and some of the footage from the two back rooms, you can see that as soon as the guns are drawn, Ms. Munoz ran first to her 1-year-old son, picked him up, and ran out of the store as fast as she could, so thankfully her son was not in the room when her mother and another employee were then savagely beaten by the defendant and another co-defendant.

Once the store was under control, the defendant and Alexis Vegas began to just ransack the store. And I know that the Court was able to review the footage of them

clawing, what wound up being millions of dollars of jewelry off the walls of the store and out of the display cases.

Despite the fact that the defendants took so much jewelry from the display cases and the back wall, that they ultimately could not lift the duffle bag with the jewelry alone, it took two people to get that bag out of the store, despite that, the defendant still decided to remove the jewelry that the employees were wearing on their persons as part of the robbery.

As the Court could see, another co-defendant entered the back repair room and attempted to rip the gold chain off of one of the male employees. And I provided to the Court a picture of his injuries after the robbery when the chain ultimately didn't break from his neck, and he was basically strangled by that chain.

The defendant then went back into the employee room, where two victims had tried to barricade themselves, and he assisted another co-defendant in forcing that door open, moved into the back of the store to let the remaining defendants in, and then returned to that back room.

Now, what is important when we talk about the contents of Exhibit 8, and what happened in that back employee room, is that as the Court can see, it is beyond

discussion that those two women were under control. Mr. Lozada-Solis was standing over one of them and striking her with his hands, but the two women have their arms outstretched; one is prone on her stomach, and the other is in a kneeling position. They presented no threat to the defendant. They weren't fighting. They weren't screaming. They didn't have cellphones. They essentially were entirely compliant and trying to avoid being killed in the course of this robbery.

What the Court cannot hear from the surveillance footage is that the defendant and his co-defendants repeatedly threatened to shoot the employees of the store and the customers. And specifically when the two women were prone on the ground in that back office, the defendant repeatedly threatened to kill them. At this point obviously those two women had no way of knowing whether or not he would make good on those threats.

Now, again, despite the fact that they were compliant, it is the defendant who reached around the back of the door, grabbed one of the women by her ponytail, and ripped her across the floor by her hair, before then savagely beating her with his firearm.

The defendant basically then took the level of violence that had already been on display and had already been used, and amplified it tremendously. It is

difficult, frankly, to tell from the surveillance footage, just how hard those strikes were to that victim's head. And the defendant then moved to the next victim and similarly struck her in the head with his firearm.

I noted to the Court in my response to the sentencing statement that both of those women suffered severe scalp lacerations, and not the sort of laceration that happens when, you know, you bump your head or get sort of a blunt impact or blunt force trauma, they actually required staples because the lacerations were so deep that they couldn't be closed in any other way.

So while now these victims were bleeding profusely they had to lay there, again, still trying to comply, still trying to avoid being shot and killed by this group, and had to watch as their life savings and their futures were stolen, packed into bags, and taken by the defendants.

As part of his assault on these two victims, the defendant ripped the jewelry off of one of their necks and put it in his bag, because apparently it was not sufficient to simply ransack the store and steal the inventory, he chose to personally victimize each of those women and take the jewelry off of their persons.

After ransacking the store, the defendant and his co-defendants fled in their waiting vehicles, then went

into hiding in Denver for about a day or two, before ultimately moving as a caravan and sort of one after another, down to El Paso, Texas, where the plan was to cross the border and to eventually go to Venezuela by way of Mexico.

Immediately after the robbery, as I think the Court could see from some of the photos I provided, the victim employees and customers sort of got together, started to process what had happened, and saw that their store was ransacked. Their blood was soaked into the carpet. There were bloody fingerprints on the panic button that they hit time after time trying to get help. And then ultimately they were able to ask -- or, rather, to call the police and to get police assistance shortly thereafter.

In the hours that followed the robbery, the victims had to recount what happened to them over and over again. Those two women had to seek medical attention that required follow-up visits. And then they had to get into the administrative part of a loss and a tragedy like this, which is hospitals, doing repairs on the store, fighting with insurance companies, and then realizing, as all of this is taking place, that the suspects and the group of people that committed this robbery were not identified or in custody.

So in the days and weeks that followed, these

victims dealt with knowing that their assailants could come back at any minute; that at least for the few days following the robbery, they were not in custody and could re-appear at any time.

Moving forward then to the weeks and months that followed the robbery, as the Court heard from Ms. Munoz, the impact of the loss became more and more clear. The store was insured for $1.9 million, leaving a loss of more than $1.9 million for the store to absorb on its own. The bulk of the jewelry taken by the defendant and his co-defendants has never been recovered, and is unlikely to be recovered.

As Ms. Munoz told the Court, the store cannot be reinsured at the same rate, so they effectively now are punished for being the victims of a robbery, and can't get insurance at the same rate they could before. They are being required to make significant changes in improvements that they, of course, must pay in cash up front, which they can't afford.

One of the victim employees told me that essentially the business was her retirement plan; that if things went well, the business continued to succeed, that is how she would retire, and she now doesn't know if she is ever going to be able to retire or recover from the loss.

On a personal and human level, these victims are in an interesting position in compared -- excuse me, in comparison to other robbery victims. And I know that this Court has heard and has presided over multiple cases involving bank robberies. In those cases, the victims are undoubtedly every bit as traumatized as those in this case, but as a bank employee, those victims can request a transfer to a different bank, many of them change careers, but here this is a family business that only runs and operates if these victims continue to go to work and continue to put themselves in the position to be traumatized day after day, wondering whether this is going to happen again.

Another victim employee told me a story that she has colored her hair for decades, she has always gotten her hair colored, it is part of her identity, and that after being beaten with a firearm by the defendant, she no longer gets her hair colored because she can't stand anyone touching her scalp or feeling anyone's hands over her incision.

And she said to me, that seems like something that is so small and so trivial in the scope of the loss, but I think that highlights for the Court the human impact that we would not necessarily know or think to ourselves, that continues to impact these victims on a daily basis.

To respond briefly to a few points that my colleague made, I disagree entirely with the assertion that the defendant was only sort of moderately associated with the Tren de Aragua gang or was a new member to the Tren de Aragua gang.

The evidence that I provided the Court and the evidence from this investigation is that the defendant's association had actually gone back to his time in Colombia; that he had been working with and for Tren de Aragua before coming to the United States, and that the purpose of this robbery was to benefit not just the individual defendants, but also Tren de Aragua leadership.

And as I indicated to the Court in my response, it is clear from the evidence in this case that upper-level TdA leadership were aware of this robbery, approved the robbery, and then ultimately intended to profit, and likely did profit, from the robbery.

After the robbery, this smaller group of Tren de Aragua members celebrated the robbery and the success of it widely. One of the co-defendants was posting videos on WhatsApp, where basically they show piles of the jewelry individually packaged up and they are sort of celebrating.

One of the videos that I provided to the Court, and that I think the Court was able to review, showed the defendant on a video call where the group sort of

identifies themselves by suspect names from the police bulletin, and are sort of celebrating that they pulled off this robbery and that they are suspects on a Denver Police Department bulletin.

The defendant also posed for photos with his co-defendant and girlfriend, Edwuimar Colina-Romero. Those photographs were recovered from her phone.

So while certainly the defendant has absolutely taken accountability in this case, and that accountability is accounted for with his acceptance of responsibility under the guidelines, I also want to note sort of the level of glee that this group had after pulling off this robbery.

The defendant did not simply have the opportunity to take part in the robbery, he actually recruited other participants, as many of his co-defendants said in post-arrest interviews. And he also took it upon himself to take a primary role in the robbery. He took it upon himself to make sure that they took as much jewelry as they could physically carry up, and including the jewelry off of the bodies of the victims.

He also escalated the violence during the robbery to a level that was absolutely not necessary, and brought it to a level where the violence had not been prior to his entry into those back rooms.

It is for those reasons that the Government asserts that a sentence of 192 months imprisonment, which is the very top of the advisory guideline range, followed by 5 years of supervised release, is minimally sufficient, but not greater than necessary, to achieve the aims of 18 U.S.C. 3553(a)(2).

I think probation, frankly, said it most accurately in this case when they described the footage and the events that unfolded as almost like something that you would expect to see in a B-list Hollywood movie. It almost couldn't be believed in terms of the brazenness and the violence, except that for these victims that robbery was a reality, and a reality that they will continue to live with into the future.

I am happy to answer any questions that the Court may have.

THE COURT: Thank you, Ms. Perczak.

Mr. Castillo-Delgado, at this time you have the opportunity to speak and tell me anything you would like me to know as I make my sentencing decision. You are under no obligation to speak, but if you would like to say something, I am I will be happy to listen.

THE DEFENDANT: Of course I would like to say something, but really I would like to say that I am not a member of Tren de Aragua. I wanted to plead guilty and

take responsibility for this. And I'm not a member of a group like that.

And, honestly, I did steal because my mother was in prison in Colombia and she was requesting a lot of money in order to have her free, and I would do whatever I could for my mother, do you understand? And the truth is, I will spend years in prison, and I am willing to do that, that doesn't matter to me, because what matters to me is my mother and my grandfather.

But I am not a puppet of anybody. I did this on my own, and I take responsibility for this, and I will serve this sentence that you impose. But I just want to say that -- to say that someone else organized this, no, that's a lie.

And, well, like she says, that we were celebrating because we were part of Tren de Aragua, that is not true. I was not following anybody else's orders, I was only following my own. And if she was saying we were celebrating, the only reason I was joyful is because I thought I could get my mother out of prison, but now she is going to be there for 17 years, and that is the only thing that truly pains me, not for me, myself, and I will live with this.

And I understand all of the facts of this case, and I'm really sorry that -- I'm glad no one died. And I am

really sorry for what I did, and I will always have to live with this. But I really did it -- it was something that was very unconscious and also because of being under the effect of drugs. And I would like to say I am very sorry for all of that. And these are things that I cannot change. What happened is what happened, and I just can only go forward.

I accept any punishment that will be imposed, and I accept responsibility for the charge, but the truth is, I'm not a puppet of anybody, and so I can't accept that the U.S. Attorney says that I'm part of an organization, because there was no one else. I organized all of it just on my own.

(Off-the-record discussion had.)

MS. GRISMER: Thank you, Your Honor, I just needed a minute. I appreciate that. I think we are ready to continue.

THE COURT: All right. Thank you.

All right. Although I may not mention all of them, I have carefully considered the factors set forth in 18 U.S.C. Section 3553(a). My responsibility here is to determine a sentence that is sufficient, but not greater than necessary, to comply with the purposes as set forth in Section 3553(a)(2).

In considering the sentencing guidelines, I do not

start from the presumption that the guidelines are reasonable, instead I must make an individualized assessment based on the facts presented.

The factors that I review include the nature and circumstances of the offense; the history and characteristics of the defendant; the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need to afford adequate deterrence to criminal conduct; the need to protect the public from further crimes of this defendant; the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences available; the kinds of sentence and sentencing range established for someone who commits this category of offense and has this criminal history level as set forth in the sentencing guidelines; any pertinent policy statements in the sentencing guidelines issued by the Sentencing Commission pursuant to 28 U.S.C. Section 994(a)(2) and in effect on the date the defendant is sentenced; the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.

The Court begins by reviewing the nature and

circumstances of this offense. On June 24, 2024, Mr. Castillo-Delgado, you and your co-defendants robbed a jewelry store at gunpoint. Two vehicles and one motorcycle arrived at the store shortly before 2:00 p.m. One male suspect from those vehicles entered the store roughly at 1:48.

The male entered the mantrap area of the store and was permitted to enter by store staff, and then this individual, co-defendant Lozada-Solis, began to observe the merchandise in the store while sending messages to his co-defendants to enter. Shortly thereafter, three men, including the defendant, entered the store and drew firearms.

The defendant was dressed in black pants, a black sweatshirt with white detailing on the shoulders, a black baseball cap, and was wearing a cross-body satchel, and one white glove. He was armed with a semiautomatic Taurus pistol. He and his co-defendants ordered the victim employees and customers to the ground and held them at gunpoint. The defendant jumped over the counters with another co-defendant and began taking jewelry from the display cases and wall-mounted jewelry racks.

The co-defendants and the defendant grabbed gold jewelry, including chains and rings, and they began placing them in duffle bags and backpacks, and began to

ransack rooms in the back of the store, removing jewelry from storage and repair areas.

Shortly thereafter, Mr. Castillo-Delgado, you entered an employee-only room behind the jewelry display counters and ordered three store employees to the ground at gunpoint, forced your way back into the back repair room, and grabbed a victim by the neck, dragging him from his chair to the ground at gunpoint.

You told him in Spanish, "get on the ground or I will kill you," and then struck the back of his head with the firearm. You attempted to rip the chain off of his own neck, but was unsuccessful, and again told him, "if you move, I will kill you," before going into the employee office area.

Inside the employee office, the defendant and another co-defendant violently assaulted two additional victims. One was forced to the ground and held at gunpoint and told to stay on the ground. One was dragged by her hair to the ground by the defendant, and then struck her repeatedly in the back of the head with his firearm, causing injury.

While they were on the ground, the defendant and his co-defendants loaded multiple bags with stolen jewelry and began moving the bags out of the store via the back door.

Mr. Castillo-Delgado, you and your co-defendants then exited the back of the door and fled the area in waiting vehicles and a motorcycle. In total, you took approximately $4.3 million in jewelry and gold during the robbery.

After the robbery, you drove from Denver, Colorado, to El Paso, Texas, and there you were arrested by federal agents during the execution of a search warrant on June 27, 2023.

In addition, it indicates in the facts that are not in dispute, and were not disputed in your objection, that you continued through the office to the jewelry repair room where one of the victim was working, and that when you encountered him, he tried to shut the door, but you barged into the door, you grabbed him by the neck, shoved him to the ground, and threatened to kill him if he moved, and pistol whipped him on the back of the head.

It also indicates that in the other employee office, you dragged another victim by her hair away from the door, and then pistol whipped her on the back of the head repeatedly, and did the same thing to the second victim in that room.

I now turn to the history and characteristics of this defendant. Mr. Castillo-Delgado, your mitigation report indicates that you came to the United States to

seek a better life for yourself and your family. And in the words of the mitigation report, to quote, "fulfill the American dream." That is Docket Entry No. 157-1 at 7.

But almost immediately you began committing crimes. And I do not underestimate whatever trauma you may have endured as child, losing your father and stepfather to violence. But it seems that -- it appears that since you entered the United States as an unlawful immigrant, you've not only worked not to obtain the American dream, but you have consistently broken the law and wreaked the same violence on others in the community as your own family endured in Venezuela.

I do not overlook the fact that you came here as an undocumented immigrant and that you may have wanted to be here in the United States to try to forage a better life for your family members in Venezuela, and potentially you even felt like you did not have a different option.

But every day people come to the United States, both documented and undocumented, and they do not commit crimes and they do not wreak violence and they do not point guns at children and they do not take away the livelihood of a family who has worked in the Denver community to build a life, not only for themselves, but a resource for a community of immigrants and non-immigrants, to be taken away.

I note the PSR indicates that the insurance does not cover the entirety of the jewelry or gold that was taken, and that approximately $1.9 million remains outstanding. The business is struggling to find an insurance company to cover their business after the robbery.

And as Ms. Munoz testified, or stated here today, that she and the other victims who have submitted letters continue to have non-financial impacts every day, including her 13-year-old daughter.

The Court now turns to some additional factors, including the need to reflect the seriousness of the offense, to promote for the law, and to provide just punishment; the need to afford adequate deterrence to criminal conduct; the need to protect the public from further crimes of this defendant; and the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.

And while you contested and objected to the additional charges that are reflected in the presentence investigation report, weighing that they have not yet been adjudicated fully, the Court notes that in the presentence investigation report, it appears that this conduct was not only not a mistake, but it was the escalation of a

pattern.

Paragraph 66 recounts allegations associated with a robbery with another co-defendant, a struggle ensued, and the defendant reached over the counter and pulled a necklace out of an open display case. This is the case in which the mitigation report is associated, which at the end of the mitigation report indicates that you would be willing to serve a sentence of probation.

Paragraph 67 includes allegations of breaking into a department store, with sledge hammers into the jewelry cases, and stealing merchandise of approximately $162,000. And, of course, the offense conduct here.

You have indicated that you did this because you were trying to get your family -- or your mother out of prison, where she is serving a term of incarceration, and that you have also indicated in your mitigation report that your main objective is to get back to your grandfather and your daughter, but the very acts that you have determined were appropriate to reach those ends has caused incredible and deep and grave consequences to this country, again, which you are not lawfully present, and to families who have spent years and years building their livelihoods and building their own American dream.

Therefore, pursuant to the *Sentencing Reform Act* of 1984, the Court will, in fact, vary upward from the

guideline range for the reasons stated. I can think of almost no other type of crime -- and thankfully, as you have noted, there were no people who were killed in this robbery. But the amount of violence that is reflected in the exhibits and the videos that were provided to the Court, are incredibly explicit with respect to the amount of violence and the unnecessary amount of violence and threats that were meted out on these unsuspecting customers and family members who owned this business.

Therefore, pursuant to the *Sentencing Reform Act* of 1984, it is the Judgment of this Court that the defendant, Newman Castillo-Delgado, will be sentenced to 156 months as to Count 1, and 84 months as to Count 2, to be served consecutively to Count 1.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of 3 years. The Court finds that this term length is appropriate based on an individualized assessment of the factors set forth in 18 U.S.C. Sections 3553(a) and 3583(a) through (c). The term imposed considers the nature and circumstances of this offense and the history and characteristics of this defendant.

Further, this term is sufficient, but not greater than necessary, to address the purpose of imposing supervised release on this defendant. The term consists

of 3 years on Count 1 and 3 years on Count 2, all such terms shall run concurrently.

Within 72 hours of the release from the Bureau of Prisons, the defendant shall report to the probation office to the district in which the defendant is released, if he is not immediately removed from the United States.

While you are on supervision, you must not commit any federal, state, or local crimes, and must not possess a controlled substance. You must refrain from any unlawful use of a controlled substance. You must submit one drug test within 15 days of release from imprisonment, and a maximum of 20 test per year of supervision thereafter.

You must cooperate in the collection of DNA, as directed by your probation officer. You must make restitution in accordance with 18 U.S.C. Sections 3663(a) and 3663, or any other statute authorizing a sentence of restitution.

You must comply with the standard conditions adopted by this Court in General Order 2020-20. The Court finds that the following special conditions of supervision are determined to be reasonably related to the factors enumerated by 18 U.S.C. Section 3553(a) and 18 U.S.C. Section 3583(d).

Further, based on the nature and circumstances of

the offense and the history and characteristics of this particular defendant, the following conditions do not constitute a greater deprivation of liberty than is reasonably necessary to accomplish the goals of sentencing. Specifically, the following special conditions are supervision are appropriate based on the defendant's history of substance abuse, his history of violence and possessing firearms, and as well as his unlawful presence in the United States:

One, you must participate in a program of testing and treatment for substance abuse, approved by the probation officer, and follow the rules and regulations of such program. The probation officer, in consultation with the treatment provider, will supervise your participation in the program as to modality, duration, and intensity.

You must abstain from the use of alcohol or other intoxicants during the course of treatment. You must not attempt to obstruct, tamper with, or circumvent the testing methods. You must pay for the cost of testing and/or treatment based on your ability to pay.

Two, you must participate in a program of mental health treatment, approved by the probation officer, and follow the rules and regulations of such program. The probation officer, in consultation with the treatment provider, will supervise your participation in the program

as to modality, duration, and intensity. You must pay for the cost of treatment based on your ability to pay.

Three, you must submit your person, property, house, residence, papers, or office to a search conducted by the United States Probation Officer. Failure to submit to such search may be grounds for revocation of release. You must warn any other occupants of the promises that the premises may be subject to searches pursuant to this condition.

An officer may conduct a search pursuant to this condition only when reasonable suspicion exists that there has been a violation of your supervision, and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

Four, you must not knowingly associate with or have contact with any individuals you know to be or have reason to believe are gang members, and must not participate in any gang activity, including the displaying of any gang paraphernalia.

And let me be clear, Mr. Castillo-Delgado, it doesn't matter to me whether or not you are a part of the TdA gang or not. The Court is making an assessment with respect to the particulars of your personal history, the circumstances of this trial -- I am sorry, the

circumstances of this case, and whether or not you have done this on your own as you insist or at the behest of a gang, the fact of the matter is that this offense occurred, and the circumstances of this offense are being weighed by this Court.

Five, if you are deported, you must not thereafter re-enter the United States illegally. If you re-enter the United States legally, you must report to the nearest United States Probation Office within 72 hours of your return.

Six, if the Judgment imposes restitution, you must pay restitution in accordance with the schedule of payment sheet of this Judgment. You must also notify the Court of any changes in economic circumstances that might affect your ability to pay restitution.

Seven, you must not incur any new credit charges or open any additional lines of credit without the approval of the probation officer, unless you are in compliance with the periodic payment obligations imposed pursuant to the Court's judgment and sentence.

Eight, you must provide the probation officers access to requested financial information and authorize the release of any financial information until all financial obligations imposed by the Court are paid in full.

Nine you must pay -- must apply any moneys received from income tax refunds, lottery winnings, inheritances, judgments, and any anticipated or unexpected financial gains to the outstanding Court-Order financial obligation in this case.

Ten, if you have an outstanding financial obligation, the probation office may share any financial information or employment documentation relevant to you with the Asset Recovery Division in the United States Attorney's Office to assist in the collection of the obligation.

It is the Court's practice to order -- oh, I am sorry, you must make restitution to the victim in the amount indicated in the presentence investigation report. It is ordered that restitution will be jointly and severally ordered with respect to the following defendants: Oswaldo Lozada-Solis, Jesus Daniel Lara Del Toro, Jean Franco Torres-Roman, Edwuimar Colina-Romero, Derek Alexander Dun-Vargas, Briley Ballera-Farias, and Keiber Jaen-Martinez. Each victim shall receive an approximately proportional payment based on the victim's share of the total loss.

The defendant shall pay a special assessment fee of $200, due and payable immediately. The Court finds that the defendant does not have the ability to pay a fine, so

the Court will waive the fine in this case. The Court has determined that the defendant does not have the ability to pay interest, so it is ordered that the interest requirement is waived for restitution.

It is ordered that the payment of the total monetary obligations shall be due as follows: The special assessment and restitution are due immediately. Any unpaid monetary obligations upon release from incarceration shall be paid in monthly installment payments during the term of supervised release. The monthly installment payments will be calculated as at least 10 percent of the defendant's gross monthly income.

Pursuant to 32.2 of the Federal Rules of Criminal Procedure, the defendant shall forfeit his interest in the following property to the United States: Jewelry, or any other money judgment in the amount of the jewelry stolen.

The defendant is advised of his rights to appeal the sentence. If the defendant desires to appeal, a Notice of Appeal must be filed with the Clerk of the Court within 14 days after the entry of Judgment or the right to appeal will be lost.

If the defendant is unable to afford an attorney for an appeal, the Court will appoint one to represent him. And, if the defendant so requests, the Clerk of the Court must immediately prepare and file a Notice of Appeal

on behalf of the defendant.

It is ordered that the defendant is remanded to the custody of the United States Marshal.

Anything further on behalf of the Government?

MS. PERCZAK: No, Your Honor. Thank you.

THE COURT: Anything further on behalf of the defendant?

MS. GRISMER: No, Your Honor.

THE COURT: Thank you very much, we will be in recess.

(Proceedings conclude at 2:43 p.m.)

**R E P O R T E R ' S   C E R T I F I C A T E**

I, Darlene M. Martinez, Official Certified Shorthand Reporter for the United States District Court, District of Colorado, do hereby certify that the foregoing is a true and accurate transcript of the proceedings had as taken stenographically by me at the time and place aforementioned.

Dated this 27th day of January, 2026.

______________________________

s/Darlene M. Martinez

RMR, CRR